The motion is denied and the appeal will be restored to the calendar for further proceedings.

---

## Appeal of CONSOLIDATED ASPHALT CO.          Docket No. 124.

A paving contractor making its return on a cash basis and receiving the contract price upon completion of the construction work may not withhold from gross income a reserve of a portion of the price received, estimated to be the amount required to fulfill its contract obligation to maintain the pavement in good condition for five years after its construction. ·

Submitted November 13, 1924; decided November 21, 1924.

*Donald Horne, Esq.*, for the taxpayer.

*John B. Milliken, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal involves income and profits taxes for the calendar years 1919 and 1920. Some of the facts were embodied in a written stipulation by the parties, and other facts were covered by oral testimony at the hearing.

FINDINGS OF FACT.

The taxpayer was a New York corporation organized on May 1, 1919, and engaged in the business of constructing asphalt street paving. It had no predecessor. It discontinued active business in 1921 and has been winding up its affairs since that time.

During the years 1919 and 1920 it acquired various contracts for the paving of streets within the city of New York. Some of these contracts it acquired from another corporation and in others it was the original contractor. The contracts which it took over from the Borough Asphalt Co. for paving in the Borough of Queens are not here in issue and will not be further referred to except to say that thereunder the city reserved the right to and did withhold 10 per cent of the contract price as an assurance for the maintenance of the paving during the five years ensuing completion.

Under the contracts now in question the taxpayer received the entire contract price at the time of the completion of the initial

paving construction. A typical contract introduced in evidence contained the following provision:

. The contractor shall receive the following prices as full compensation for furnishing all the materials and performing all the labor which may be required in the prosecution of the whole of the work and in all respects performing and completing the same.

No part of the contract price was retained by the city pending the five-year period of maintenance. The contract also contained the following provision:

The contractor will not be entitled to demand or receive payment for any portion of the work or materials unless the same shall be fully completed in the manner set forth in this contract and specification, and such completion shall be duly certified by the chief engineer of the bureau of highways, and until each and every one of the stipulations hereinbefore mentioned are complied with, and the work completed to the satisfaction of the president and accepted by him, and the final certificate of the completion and acceptance thereof, signed by the president and chief engineer, be filed with the comptroller, the city will pay, and hereby binds itself to pay, to the contractor, in cash, on or before the expiration of 30 days from the time of the completion of the work and the filing in the office of the comptroller of said final certificate, the whole of the moneys accruing to the contractor under this contract.

The taxpayer was required to maintain the pavement in good condition for five years after the date of its completion, in accordance with the following provision of the contract:

The contractor will immediately repair and make good, without expense to the city and to the satisfaction of the engineer, any disintegrations, cracks, bunches, or other defects of the asphalt pavement that shall measure more than three-eighths ($\frac{3}{8}$) of an inch from the under side of a straight edge four (4) feet long, which shall occur at any time during the period of five (5) years from and after the date of the final completion and acceptance of the whole work under this contract, except where a defect in the pavement is caused by imperfect back filling over subsurface work.

Its bond for the faithful performance of the contract included this five-year maintenance.

In 1919 the taxpayer took over from the Cranford Co. five contracts and in that year received as its contractual compensation thereunder the amount of $185,121.52. During the same year the taxpayer entered into contracts with the city of New York under which it received in the year the sum of $58,448.97. In 1920 it entered into contracts from which it received in that year $853,646.06.

From the above amount of $185,121.52, received under the Cranford contracts in 1919, it set aside $7,957.65, based upon an estimate of 15 cents per square yard of paving laid, which reserve was estimated as the amount necessary to maintain the pavements for the ensuing five years as required by contract. Under its 1919 contracts with the city, out of the above amount of $58,448.97, it set up a similar maintenance reserve of $1,870.50. Out of the $853,646.06 received under its 1920 contracts with the city it set aside a similar maintenance reserve of $13,907.63, based upon an estimate of 13 cents per square yard.

The taxpayer kept its books and made its return on the basis of cash receipts and disbursements. It omitted from gross income the amounts of the reserve above set forth, viz, 1919, $7,957.65 and $1,870.50; and 1920, $13,907.63. These amounts the Commissioner

includes in taxable net income, thus arriving at deficiencies of 1919, $2,514.63; and 1920, $4,565.50. The tax for both years has been computed under section 302 of the Revenue Act of 1918.

The amount of the reserves in question was estimated by one Morse, treasurer of the Cranford Asphalt Co., who at the same time looked after the accounts of the taxpayer. His entire experience had been with the Cranford Co., and his estimate was based upon this experience. The method of computing the amount of the reserve is not clear from the record. It is clear, however, that the figure of 15 cents per square yard was arrived at by taking into consideration the Cranford Co.'s figures for the period from 1910 to 1916. These showed a maintenance cost of 7½ cents per square yard from which the witness figured that the 1919 cost would be approximately 15 cents per square yard. There was very little work done in 1917 and 1918 and hence he had no figures for those years. When asked why, in 1919, he doubled the rate which the Cranford Co. had adopted from 1910 to 1916, he stated that he estimated this from the fact that labor and materials were more expensive. He then assumed that these higher costs would continue for five years. In 1920 he figured that the 1919 estimate of 15 cents " might be a little excessive " so he reduced the 1920 figure to 13 cents. This figure of 13 cents was calculated in the aggregate to equalize the excess of the previous year. He adjusted the amount so as to keep it within what he regarded as " a reasonable reserve ".

### DECISION.

The determination of the Commissioner that a deficiency exists of $7,080.13 for 1919 and 1920 is approved.

### OPINION.

STERNHAGEN: In the years 1919 and 1920 the taxpayer received from the construction of certain asphalt street paving $1,097,216.55. About this there is no dispute. The contracts under which the work was done provided that upon the completion of the work the entire price should be paid. There was no provision such as is frequently found in such contracts that the city should withhold a portion of the price as a means of assuring the proper maintenance of the pavement, paying it over to the contractor in installments as the period of maintenance elapsed. Here the only assurance that the city had was covered by the bond. Thus this amount received by the taxpayer was its own to do with entirely as it chose. It was in fact an actual receipt.

The taxpayer contends, however, that all of the amount so received was not income, and that it had the right to omit the amount which in its wisdom it set aside as a reserve to take care of the future maintenance of the pavements in accordance with its contract obligations. Its counsel urges that the amount of the reserve was a reasonable reserve for the purpose, and that such amount is not income and can not therefore be taxed and under the Revenue Act of 1918 was not attempted to be taxed. We have no doubt that the amount is income taxable under the sixteenth amendment as

gain derived from capital or labor or both combined, *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, and *Eisner* v. *Macomber*, 252 U. S. 189, and that an amount thus received comes within the gross income described in sections 213 and 233 of the 1918 Act. If it can be excluded from taxable net income, it must be by reason of a statutory deduction and not because it is not in the first instance income. It is quite true that not all amounts received constitute income; but when a taxable corporation in the course of its business of making profits receives contractual compensation for work done and material furnished, it can not contend that a part of the amount received is not income because the taxpayer is subject to a collateral obligation the fulfillment of which may require it to spend some of the amount. This is in substance what we said in the *Appeal of William J. Ostheimer*, 1 B. T. A. 18. And as we there said, this result is not changed because in the light of general experience the taxpayer feels reasonably certain of the necessity to expend the amount and is impelled by business prudence to set up a reserve therefor. In this instance good accounting and the statute may not be in strict accord, since Congress may with entire fairness tax what a very conservative and prudent business man may wish to hold in reserve. If, as is now the law in respect of the deduction for bad debts, a reasonable reserve were deductible, it would be pertinent to consider whether in this case the reserve had been reasonably estimated. Even then we have no hesitation in saying that the evidence is far from convincing as to the reasonableness of the reserve.

The question whether the probable future expenditure for maintenance of the pavements is the proper subject of a deduction when the accounts and return are made on the accrual basis is not open for our consideration, because the stipulation of the parties expressly states that the cash receipts and disbursements basis was used. The casual statement of the witness at the hearing that the accrual basis was used must be disregarded in the light of this deliberate stipulation. The use of the cash basis means that net income must be determined by including all the gross income actually received and deducting only the amounts actually paid out. It would be an obvious distortion to return only the gross income actually received and deduct therefrom both the amounts paid out and the payments anticipated.

Our attention is directed by the taxpayer to article 36 of Regulations 45, in which special provision is made by the Commissioner for so-called long-term contracts so that an equitable adjustment of receipts and expenditures may be made by a taxpayer whose income is derived mainly from construction contracts, the performance of which may extend over a period of several years. In such case the taxpayer is permitted to apportion ratably in each year his receipts and his expenditures on each contract. By its terms the article relates to uncompleted contracts. The present taxpayer, however, stipulates that its returns were made on the "basis of completed contracts as provided for in article 36 of Regulations 45", which in the light of the evidence, apparently means that they were not made on the long-term contract basis, and there is not sufficient in the record upon which the application of the method

provided by article 36 could be based. Counsel for the Commissioner refers to *Lamson Consolidated Store-Service Company* v. *Conyngham*, 32 N. Y. Supp. 129; 11 Misc. 428, as establishing that the contracts here in question were completed at the time the original construction was completed and the price paid, irrespective of the enduring obligation for maintenance. In that case the agreement to deliver and the agreement to keep in good condition were not in the same instrument, while the present contracts contain both the obligation to construct and to maintain. But they also indicate in the sections set forth in the foregoing findings of fact that the parties regarded the work as completed when the construction was finished, and hence that the undertaking to construct and that to keep in repair were separate as in the *Lamson* case. In view of these circumstances we can not say that the case is one which properly comes within article 36.

The deficiency seems to have been properly found by the Commissioner and can not be disallowed.