*Decision will be entered under Rule 50.*

NATIONAL BREAD WRAPPING MACHINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57404. Filed June 10, 1958.

*Matthew J. Glennon, Esq.*, and *Albert J. Musacchio, Esq.*, for the petitioner.

*John M. Doukas, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1949 and 1950 in the respective amounts of $1,065.47 and $1,297.70. The deficiencies determined result from the respondent's disallowance of a deduction in each year of the amount of a reserve set up for installation of bread-wrapping machines which had been sold by the petitioner in the respective years under review, but which had not been installed at the end of the year. Such disallowance is assigned as error.

For the year 1950 the petitioner claims that it is entitled to a refund of income tax in the amount of $20,900.59 based on its alleged erroneous reporting of the amount $68,976.50 as ordinary income. That amount was received by the petitioner from an English company as a portion of the selling price of machines manufactured and sold by such company under patents issued to the petitioner. The petitioner now contends that it sold an interest in the patents and that the amounts received represented long-term capital gain.

### FINDINGS OF FACT.

### General Facts.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioner is a Massachusetts corporation, with principal office at East Longmeadow, Massachusetts. It filed its income tax returns for the years 1949 and 1950 with the collector of internal revenue for the district of Massachusetts. Its returns were made on an accural method of accounting.

The petitioner was incorporated under the laws of Massachusetts in 1920 for the following purposes, among others:

To manufacture, buy, sell, lease or otherwise deal in wrapping machines, including manufacture and supply of parts and care of machines in use. To buy, sell, acquire and dispose of any letters patent, and any property real or personal for use in connection with or in carrying on the business above described. * * *

During the years 1949 and 1950 the petitioner was a subsidiary of Baker Perkins, Inc., of Saginaw, Michigan, which held a 60 per cent

stock interest in the petitioner. · The remaining 40 per cent of the petitioner's stock was held by Package Machinery Company of East Longmeadow, Massachusetts.

Baker Perkins, Inc., is a subsidiary of Baker Perkins Limited of Peterborough, England. The Forgrove Machinery Company, Ltd., of Leeds, England, is a wholly owned subsidiary of Baker Perkins Limited.

### Installation Expense.

In the taxable years the petitioner specialized in the design, development, sale, installation, and servicing of bread-wrapping machines. The function of the bread-wrapping machines was to wrap loaves of bread of various sizes and sweet foods, such as cakes, in either waxed paper or any of the films used for that purpose. The petitioner had a force of eleven or twelve employees, of whom five were field men. It had no manufacturing facilities and all of its machines and equipment were manufactured by Package Machinery Company. Most of the machines and equipment which the petitioner sold were sold through Baker Perkins, Inc., and the remainder was sold through Package Machinery Company.

In practice, the petitioner originated the designs for bread-wrapping machines. It then proceeded to make the manufacturing drawings and develop the manufacturing specifications. The petitioner's office was in the buildings of the Package Machinery Company. The petitioner turned over its drawings and specifications to Package Machinery Company which performed the manufacturing operations. During the process of manufacturing, all stages were checked and supervised by the petitioner's engineers. The machines were ultimately shipped by Package Machinery Company to points designated by the petitioner.

Among the wrapping machines designed by the petitioner, and on which it obtained patents, were models designated BW–4, BW–5, BW–6, and BW–7. The BW–4, BW–5, and BW–7 are capable of handling the same range of sizes of bread, the difference being in the speed of operation. The BW–6 is a modification of BW–5 designed to handle packaged sweet goods and rolls. The petitioner also designed attachments and items of accessory equipment related to the machines and obtained patents on such attachments and accessories.

Although sales of the petitioner's machines were made through its corporate stockholders, the sales contracts were executed by the petitioner and the buyers of the machines. The following are material excerpts from a typical sales contract:

To [Name of Customer]

NATIONAL BREAD WRAPPING MACHINE COMPANY (hereinafter called "Seller") manufacturer of the equipment below described; purposes to furnish the apparatus hereinafter described at the price stated below * * *

One—National 15-40 Bread Wrapping Machine with all Standard Equipment and with Quik Seal Refrigerated Discharge. * * *
Machine No. BW5-18751

Price includes five days free service for setting up and demonstrating machine including time spent for traveling, but Buyer pays transportation expense of our installation engineer. * * *

For shipment to you at Muncie, Indiana in about Fifteen days from date of acceptance of this order by Seller at East Longmeadow, Mass., and receipt of full information necessary to execute same.

In rare instances a customer would not require the petitioner to render installation and demonstration service.

During the years 1949 and 1950 the petitioner installed for customers 72 and 71, respectively, bread-wrapping machines of the various models. The installation costs thereof in 1949 amounted to $19,487.43 and in 1950 amounted to $19,901.97. At the end of 1949 the petitioner had sold to customers but not installed 9 machines, and at the close of 1950 it had shipped but not installed 19 of such machines. It estimated the cost of installation at $300 per machine and set up a reserve therefor which amounted, at the end of 1949, to $2,700 and at the end of 1950 to $5,700. The amounts of such reserves were added to the actual cost of installation of machines sold and installed in the respective years, and the totals—$22,187.43 for 1949 and $25,601.97 for 1950—were claimed as deductions in the income tax returns under the caption of "Installation of Machines" on Schedule K.

Actual installation costs of the 9 machines sold in 1949 and installed in 1950 were $3,103.77, and such costs with respect to the 19 machines sold in 1950 and installed in 1951 were $5,956.42.[1]

The respondent disallowed the claimed deductions of $2,700 for the year 1949 and $3,000 of the deduction claimed for the year 1950 on the ground that the deductions claimed were for contingent expenses and not deductible as expenses paid or incurred in the years claimed.

### Income from Patents.

Beginning with the year 1932, and through April 15, 1952, the petitioner obtained 9 British patents and United States equivalents pertaining to its BW-4 and BW-5 bread-wrapping machines. In addition, it obtained 11 United States patents at dates not shown pertaining to its BW-5 and BW-6 bread-wrapping machines.

In or about June 1948, the petitioner sent to the Forgrove Machinery Company, Ltd., of Leeds, England (herein called Forgrove Company), a complete set of blueprints of manufacturing drawings and parts lists with respect to its BW-5 bread-wrapping machine. It was the intention of the petitioner to furnish to Forgrove Company every-

---

[1] The average installation cost of 72 machines installed in 1949 was $270.65. Such average cost of 71 machines installed in 1950 was $280.30. Individual installation costs in those two years varied from a low in the amount of $71.47 to a high in the amount of $585.66.

thing that was necessary in the way of drawings, manufacturing information, and technical knowledge to enable it to manufacture the patented BW–5 machine. It was understood between the two companies that there would be no reservation at all as to what the petitioner would do to enable the Forgrove Company to make, sell, and service the machine in Great Britain. By September 19, 1949, the Forgrove Company was producing the BW–5 machine and at that time it expected to begin deliveries before the end of the year. The agreement as to payments to be made to the petitioner for rights under the petitioner's patents was set forth in a letter dated September 19, 1949, from the Forgrove Company to the petitioner reading in material part as follows:

According to our agreement and understanding, N. B. W. M. C. [the petitioner] are entitled to ⅓rd of any profit margin on the B. W. 5, and this margin is reached by subtracting from the selling price of the machine the sum of:—
   1. Our Works Cost.
   2. 15% of the selling price.
Works Cost is made up simply of labour and material and overhead applicable solely to Works as a percentage on labour.

By letter dated March 22, 1950, the petitioner suggested to the Forgrove Company that the "Profit Margin Agreement," as referred to in the letter of September 19, 1949, be extended to other wrapping machines which originated with the petitioner and which the Forgrove Company might wish to manufacture and sell, including the BW–4 and BW–6 machines. By letter dated April 3, 1950, the Forgrove Company advised the petitioner that "it is quite agreed and understood that these terms should equally apply to any other origination of the National Bread Wrapping Machine Company's and would cover additional equipment which is sometimes fitted." The correspondence between the two companies did not contain any time limitation as to the use of the petitioner's patents by the Forgrove Company, and it was understood by the companies that there would not be any such limitation.

In none of the correspondence between the two companies is there any statement to the effect that the Forgrove Company was to have any right to use the patented machines, or to have the exclusive right to exploit the patents in any specified territory.

Pursuant to the agreement between the petitioner and the Forgrove Company the petitioner received in 1950 from that company the sum of $68,976.50 in respect of the BW–5 machines manufactured and sold by that company. That sum was reported by the petitioner in its original income tax return for the year 1950 as income from royalties. On March 16, 1953, the petitioner filed an amended income tax return for the year 1950 in which it reported the sum of $68,976.50, received from the Forgrove Company, as long-term capital gain. At the same

time the petitioner filed a claim for refund of income tax for the year 1950 in which it alleged that a refund was due because of its erroneous failure to list the amount of $68,976.50 as long-term gain in its original return.

The respondent rejected the claim for refund.

OPINION.

## Installation Expense.

At the close of each of the years 1949 and 1950 there remained uninstalled some bread-wrapping machines which the petitioner had sold to customers in those years. The contracts under which such machines were sold obligated the petitioner to furnish "five days free service for setting up and demonstrating" the machines for the customer. Such services were performed by the petitioner's field engineers. The petitioner estimated that the cost of performing such service would be $300 with respect to each machine that had been sold in each taxable year but remained uninstalled at the close of the year. The total of such estimated cost, $2,700 at the close of 1949 and $5,700 at the close of 1950, was treated as an accrued liability and deduction therefor claimed as an installation cost.

Section 43 of the Internal Revenue Code of 1939 provides that "deductions and credits * * * shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period." The petitioner, operating under an accrual method of accounting, contends that under its sales contracts it incurred a liability for installation costs, that the amount thereof was ascertainable with reasonable certainty, and that the existence of these factors entitle it to the deductions claimed as "accrued" items. The respondent argues that the amounts claimed represented contingent expenses and liability for them had not become fixed and certain within the respective taxable years.

The deduction for items allowable by statute may be taken by a taxpayer on an accrual method of accounting in advance of payment where, within the taxable year, all events have occurred which (a) establish the existence of a definite *liability* of the taxpayer to pay, and (b) fix the *amount* of such liability.[2] On the other hand, no deduction is allowable for a year in which not all events have occurred which establish a liability to pay, or where the amount of the liability is uncertain because of an existent contingency.[3]

[2] *United States* v. *Anderson,* 269 U. S. 422; *American National Co.* v. *United States,* 274 U. S. 99; *Uncasville Mfg. Co.* v. *Commissioner,* (C. A. 2) 55 F. 2d 893.

[3] See *Brown* v. *Helvering,* 291 U. S. 193; *Security Flour Mills Co.* v. *Commissioner,* 321 U. S. 281; *Ralph L. Patsch,* 19 T. C. 189, 195, affd. (C. A. 3) 208 F. 2d 532.

In the application of these basic rules, it has been held that where the obligation is one for the performance of work or services, no deduction for an accrued liability is allowable in advance of performance. It was said in *Spencer, White & Prentis* v. *Commissioner*, (C. A. 2) 144 F. 2d 45 (affirming a decision of this Court) :

The liability for the estimated deduction clearly had not accrued during the year in which deduction was sought. The only thing which had accrued *was the obligation to do the work* which might result in the estimated indebtedness after the work was performed. [Emphasis added.]

In the case of *Amalgamated Housing Corporation*, 37 B. T. A. 817, affirmed per curiam (C. A. 2) 108 F. 2d 1010, the taxpayers claimed reserves for the anticipated cost of renovating apartments. Renovation was required periodically, the creation of a reserve for that purpose was required, and costs became known as the work was performed under a fixed-price contract. We sustained the respondent's disallowance of the deductions for the anticipated cost of renovation, and said in part:

Although the petitioners were obligated to renovate, they had no liability to pay anyone anything until someone had performed some services. The accrual is for services in renovating, not of the duty to renovate. The accrual method does not permit the anticipation of future expenses prior to the rendition of the services for which the payment is due.

To the same effect are *Capital Warehouse Co.* v. *Commissioner*, (C. A. 8) 171 F. 2d 395, affirming 9 T. C. 966; *Bressner Radio, Inc.*, 28 T. C. 378 on appeal (C. A. 2), relying upon *Brown* v. *Helvering*, 291 U. S. 193; and *Denise Coal Co.*, 29 T. C. 528.

In support of its position the petitioner cites *Harrold* v. *Commissioner*, (C. A. 4) 192 F. 2d 1002. We recognize that there is some divergence of view among the courts as to what constitutes a deductible accrued item. Cf. also *Patsch* v. *Commissioner*, (C. A. 3) 208 F. 2d 532, and *Schuessler* v. *Commissioner*, (C. A. 5) 230 F. 2d 722. Nevertheless, we think the correct view is reflected in the cases first above cited, which are in accord with the settled view of this Court, which was reiterated in the recent case of *Denise Coal Co., supra.*

There can be no doubt that under its sales contracts the petitioner was obligated to render some services in connection with the installation of its machines and the estimate of cost made by the petitioner was not substantially different from the amounts subsequently expended. However, until those services were rendered there was no definite liability on the part of the petitioner to pay any amount to any person. The liability was contingent until there was performance. On this issue, we sustain the respondent.

## Income from Patents.

In the year 1950 the petitioner received from the Forgrove Company a total of $68,976.50, representing a part of Forgrove's profit margin on the sale of BW–5 machines manufactured under the petitioner's patents. The petitioner contends that that sum represented payments on account of the sale of a capital asset and was not royalty payments.

The legal consequences and the tax consequences of agreements transferring interests in patents have been considered in many cases, most of which turn upon the application of the principles laid down in *Waterman* v. *Mackenzie*, 138 U. S. 252, to the facts of the particular case for the purpose of determining whether the transfer under review constituted an assignment or a license. One of the elements upon which stress is placed in the cited case is the exclusiveness of the right or rights conveyed. The opinion in that case says, in part:

For instance, a grant of an exclusive right to make, use and vend two patented machines within a certain district, is an assignment, and gives the grantee the right to sue in his own name for an infringement within the district, because the right, although limited to making, using and vending two machines, excludes all other persons, even the patentee, from making, using or vending like machines within the district. *Wilson* v. *Rousseau*, 4 How. 646, 686. On the other hand, the grant of an exclusive right under the patent within a certain district, which does not include the right to make, and the right to use, and the right to sell, is not a grant of a title in the whole patent right within the district, and is therefore only a license. * * * So is [a license] an instrument granting "the sole right and privilege of manufacturing and selling" patented articles, and not expressly authorizing their use, because, though this might carry by implication the right to use articles made under the patent by the licensee, it certainly would not authorize him to use such articles made by others. * * *

In *Lynne Gregg*, 18 T. C. 291, affirmed per curiam (C. A. 3) 203 F. 2d 954, we stated:

The rationale of the *Waterman* case has subsequently been followed and reiterated on numerous occasions. For one such instance see, e. g., *United States* v. *General Electric Co.*, 272 U. S. 476, wherein it was said that in order for a transaction to constitute an assignment or a sale there must be a conveyance of, " * * * (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States. * * *" See also, *Cleveland Graphite Bronze Co.*, supra, at p. 988. It is settled law that anything short of the foregoing is not a sale or assignment but rather a license which gives the licensee no title to the patent. *Waterman* v. *Mackenzie*, supra; *United States* v. *General Electric Co.*, supra; *Gayler* v. *Wilder*, 10 How. 477; *Moore* v. *Marsh*, 7 Wall. 515; *Crown Co.* v. *Nye Tool Works*, 261 U. S. 24.

The petitioner has the burden of establishing that what it granted to the Forgrove Company was "an exclusive right to make, use and vend" the patented bread-wrapping machines in a specified district. This it

has attempted to do by placing in evidence a series of letters between itself and the Forgrove Company which constitute their agreement. Upon examination of the correspondence we are unable to find therein the exclusive grant which is necessary to effect a sale.

The only evidence in amplification of the agreement as set forth in the letters is the testimony of the president of the petitioner. He testified that it was his understanding and intention to furnish the Forgrove Company everything that was necessary in the way of drawings, manufacturing information, time studies, technical know-how, both as to the manufacture and application of the machine, and that the petitioner had no reservations at all as to what the petitioner would do to enable Forgrove to make, sell, and service the machine in its market, which was Great Britain.

Neither the above letters nor the testimony referred to disclose any intent whatever on the part of the petitioner to grant to the Forgrove Company exclusive rights under the petitioner's patents. As we have said, exclusiveness is a necessary element of a sale.

It has been said many times that the question of whether a transfer of an interest in a patent constitutes an assignment on the one hand, or a license on the other, is not governed by the use of particular words of art. *Watson* v. *United States*, (C. A. 10) 222 F. 2d 689; *Rose Marie Reid*, 26 T. C. 622; *Robert L. Holcomb*, 30 T. C. 354. However, to establish that an assignment was made it is necessary to adduce evidence to show that the parties intended the grantee to have the exclusive right to make, use, and sell. We find no such evidence in the record in this case. There is no evidence at all to indicate that the petitioner could not have granted patent rights to other concerns in England.

Furthermore, here, as in *Cleveland Graphite Bronze Co.*, 10 T. C. 974, affirmed per curiam (C. A. 6) 177 F. 2d 200, there was no grant of the right to use the product covered by the invention. In that case we said:

Construing the 1938 agreement in conjunction with the 1932 letter agreement, as we must, and applying the principles heretofore set forth, the 1938 agreement was no more than an exclusive license to make and sell various products covered by petitioner's English patents. The transfer was not a grant of the whole of the English patents. One of the three rights comprising the whole thereof, i. e., the right to use, was not expressly included in the grant. A grant of an exclusive right under a patent within a certain district which does not include the right to make, the right to use, and the right to sell, is only a license. *Waterman* v. *Mackenzie, supra.*

The petitioner argues that because of its relationship to Forgrove Company (both being subsidiaries of Baker Perkins, Ltd.) there was no need for a more formal agreement. Petitioner seems to imply that because of the relationship there must have been a transfer of all

necessary rights to constitute a sale without using appropriate language to establish an exclusive license to make, use, and sell in a specified territory. However, the petitioner and Forgrove were separate corporations and insofar as we know were dealing at arm's length. We think the tax consequences must be governed by the evidence presented as to their agreement.

The petitioner also argues that there is nothing in the correspondence which indicates a licensing agreement. But the burden of proof was upon the petitioner to show affirmatively that there was a sale, and this it has not done. The capital gain provision of section 117 is an exception to the normal tax requirement of the Internal Revenue Code, *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46, and a taxpayer must bring itself clearly within the exception in order to obtain its benefits. For reasons pointed out above, the petitioner has failed to establish that it comes within the exception.

*Decision will be entered for the respondent.*