Byron H. Pyle and Ruth Kennedy Pyle v. Commissioner.
Pyle v. Commissioner
Docket No. 91567.
United States Tax Court
T.C. Memo 1964-94; 1964 Tax Ct. Memo LEXIS 242; 23 T.C.M. (CCH) 568; T.C.M. (RIA) 64094; April 13, 1964
Edward A. Fogel and Isaac Gluckman, for the petitioners. Lee Kamp and John B. Murray, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies of $195,908.68 and $38,712.36 in the income tax of the petitioners for 1955 and 1957, respectively. The issues for determination are the correctness of the respondent's action: (1) in determining that in 1955 the petitioner Ruth Kennedy Pyle received royalty income in the amount of $220,381.62 which was not reported in the return of the petitioners for that year; (2) in failing to determine that amounts totaling $157,141.12 received by petitioner Ruth Kennedy Pyle in 1955 pursuant to certain contracts involving patents and reported as income from royalties in the return of petitioners for that year *243 constituted long-term capital gain realized on the sale or exchange of patents; and (3) in failing to determine that an amount of $109,076.35 received by petitioner Ruth Kennedy Pyle in 1957 pursuant to certain contracts involving patents and reported in the return of the petitioners for that year as long-term capital gain constituted long-term capital gain realized on the sale or exchange of patents. General Findings of Fact Some of the facts have been stipulated and are so found. The petitioners are husband and wife and timely filed their joint Federal income tax returns for 1955 and 1957 prepared on the cash receipts and disbursements method of accounting and on the basis of calendar years with the district director of the then Upper Manhattan district of New York. Since petitioner Byron H. Pyle is involved herein only by reason of joint income tax returns having been filed, petitioner Ruth Kennedy Pyle sometimes hereinafter will be referred to as the petitioner. The petitioner is the daughter of Joseph E. Kennedy who died prior to the trial herein. During the following periods Joseph E. Kennedy, as patentee, applied to and received from the indicated foreign countries *244 the indicated total number of patents: Foreign
Total number
From
To
country
of patents
4/20/1909
8/19/1955
Great Britain
52
5/ 1/1913
6/ 9/1955
Australia
15
11/26/1919
8/31/1955
France
32
6/30/1924
2/26/1958
Italy
10
Total
109 The life of British, Australian, and Italian patents is 16 years from the date of application therefor. The life of French patents is 15 years from the date of application therefor but can be extended to 20 years from the application date. On an undisclosed date prior to 1940 Joseph E. Kennedy organized Kennedy Van Saun Manufacturing and Engineering Corporation, sometimes hereinafter referred to as KVS, a Delaware corporation which thereafter and now is engaged in the manufacture of heavy machinery and equipment used primarily in the cement industry. During the years 1950 through 1955, KVS had outstanding 19,700 shares of common stock. The officers of the corporation during that period were as follows and they owned shares thereof as indicated: No. of shares
of common
Official title
stock owned
Joseph E. Kennedy
Chairman of the board
4,103
F. O. Reedy
President
8
Byron H. Pyle
Vice President
Maurice Shafer
Vice President
F. N. Irving
Secretary and treasurer
10
T. J. McDermott
Assistant treasurer
Ruth Kennedy Pyle
Assistant treasurer
10,280
John H. Bausch
Assistant secretary and assistant treasurer
R. Safian
Assistant secretary
Total
14,401
*245 Of the remaining 5,299 shares of outstanding stock, 339 shares were held by the corporation as treasury stock and the remainder of 4,960 shares was owned by approximately 30 individuals who were unrelated to Joseph E. Kennedy and petitioner. None of the officers of the corporation were related except Joseph E. Kennedy, the petitioner, and Byron H. Pyle. In 1961 McNally Pittsburgh Manufacturing Corporation purchased all of the outstanding capital stock of KVS pursuant to a sales agreement wherein it guaranteed the payment by KVS in 10 equal annual installments, beginning in 1962, of all indebtedness owing by KVS to its stockholders at the time of the sale. The parties herein have stipulated that: Numerous instruments and contracts herein attached as Joint Exhibits embody or bear the name and/or signature of J. E. Kennedy, Agent, or Joseph E. Kennedy, Agent. It is agreed for all purposes that J. E. Kennedy, Agent, or Joseph E. Kennedy, Agent, was the agent of Ruth Kennedy Pyle, the petitioner herein. Since under the foregoing stipulation the petitioner was the principal involved in such instruments and contracts, she, and not J. E. Kennedy, Agent, or Joseph E. Kennedy, Agent, *246 will be shown and treated hereinafter as party to such instruments and contracts. Issue 1. Respondent's Determination That Petitioner Received Royalty Income of $220,381.62 in 1955 Taxable as Ordinary Income Findings of Fact On August 16, 1927, Joseph E. Kennedy and Compagnie des Entreprises Industrielles, sometimes hereinafter referred to as CEI, of Paris, France, entered into a contract wherein Kennedy granted to CEI the right to make and sell in France specified machinery for Joseph E. Kennedy or his nominee under French patents owned by Kennedy. This contract was for a term of 15 years or as long as it was satisfactory to both parties. On July 26, 1930, Joseph E. Kennedy executed an instrument reading as follows: IN CONSIDERATION of One ($1.00) Dollar and other considerations, receipt of which is hereby acknowledged, I hereby sell, transfer, assign and convey to Ruth Margaret Kennedy [petitioner], her heirs, executors, administrators and assigns: 1. Any and all income that I may be entitled to receive under and by virtue of a contract dated August 16, 1927 between the Compagnie des Entreprises Industrielles and Joseph E. Kennedy of which contract the original is *247 hereto attached, said contract covering the manufacture of Kennedy equipment in France or Europe or any foreign country outside of North and South America; 2. Any and all patents and applications for patents and rights that may accrue to me under and by virtue of any and all patents, extensions or renewals of patents heretofore granted me or filed by me or hereafter to be filed by me in any country outside of North and South America and covering any and all of the various items of machinery, equipment and fixtures and/or used or useable in connection with the manufacture of any and all of the various items of machinery, equipment and fixtures referred to in Exhibit "A" hereto annexed and made a part hereof; 3. Any and all personal property and rights of any and every nature, in which I have granted to the Compagnie des Entreprises Industrielles an interest or right by said contract dated August 16, 1927 or to any other company to which rights have been granted or will be granted in any country outside of the territory embraced in North and South America; 4. The right to manufacture and/or sell any and all of the said machinery referred to in Exhibit"A" in the Dominion of Canada *248 in common with the Kennedy Products Corporation [a corporation not otherwise described in the record]. This present grant, assignment and conveyance, however, is subject to any and all rights which Kennedy Products Corporation may have under a contract with the Sheepbridge Coal and Iron Company, which contract expires in approximately two and one-half years or sooner unless all contracts covered between either the Kennedy Products Corp., or Kennedy Van Saun Mfg. and Eng. Corp. and Joseph E. Kennedy or assigns have been full carried out. Pursuant to the foregoing instrument the petitioner became the owner by gift of all of the 109 patents granted to Joseph E. Kennedy by Great Britain, Australia, France, and Italy during the period from April 20, 1909 to February 26, 1958, heretofore set out. Exhibit A referred to in the foregoing instrument was entitled "Kennedy Products" and listed more than 300 items which were classified into 8 groups. By a contract between petitioner and CEI executed June 10, 1946, under undisclosed circumstances, the parties canceled the contract of August 16, 1927, between Joseph E. Kennedy and CEI. By the contract of June 10, 1946, which was for a term *249 of 30 years, the petitioner granted to CEI the exclusive right to make and sell in France and other specified countries specified machinery under French patents owned by petitioner. On March 21, 1949, the foregoing contract of June 10, 1946, was canceled by the parties thereto. At the time of the cancellation CEI was indebted to petitioner for unpaid royalties for the period beginning March 1, 1939 and ending March 31, 1949. At the time of the cancellation the petitioner and CEI had not agreed on the amount of such royalties and subsequently the amount thereof became a matter of controversy between them. For many years CEI also had been the sales agent in France for KVS with respect to machinery and equipment produced in America by KVS. CEI and KVS terminated this relationship simultaneously with the cancellation of the contract of June 10, 1946, between petitioner and CEI. At the time of the termination of the sales agency of CEI, KVS was indebted to CEI for sales commissions, the amount of which had not been agreed upon by KVS and CEI and which subsequently became a matter of controversy between them. Subsequent to the cancellation of the contract of June 10, 1946, between *250 petitioner and CEI, the petitioner and Office General Pour Les Travaux de Genie Civil et Les Amenagements Industriels, sometimes hereinafter referred to as OFTA, of Paris, France, executed a contract on July 14, 1949, wherein petitioner granted OFTA the exclusive right to make and sell in France and other specified countries certain machinery under French patents owned by petitioner. The term of the agreement was for 30 years with a provision for renewal for an additional period of 30 years. Some or all of the patents involved in the foregoing contract with OFTA had been involved in the contract of June 10, 1946, between petitioner and CEI. Some months after the execution by petitioner and OFTA of the contract of July 14, 1949, OFTA complained to petitioner that CEI, notwithstanding the termination of its contract of June 10, 1946, with the petitioner, was continuing to make and sell products covered by the patents involved in its (OFTA) contract with petitioner and that it was necessary that such action by CEI stop because it seriously affected the value of OFTA's contract. On May 9, 1950, petitioner executed a power of attorney to OFTA wherein she authorized it, at its expense, *251 to commence and prosecute in French courts all actions and proceedings against CEI necessary for the purpose of restraining by injunction or otherwise the making and sale by it of machinery covered by the contract of June 10, 1946, and for the recovery of damages. Thereafter, in 1950, OFTA instituted legal suit in France against CEI. When OFTA instituted suit in France against CEI, the latter countered in the suit with a claim for selling commissions due to it from KVS. Thereupon the petitioner sought advice from her attorney, who also was attorney for KVS, as to the steps to be taken by her for collecting from CEI the royalties then owing by it to her. The attorney was of the opinion that it would be a practically hopeless undertaking for petitioner to institute a suit against CEI to collect the royalties owing by it to her. The attorney was aware that such a suit would have to be brought and prosecuted in France which would be expensive to petitioner. He also was of the opinion that if such suit was brought, CEI would attempt to tie it in with and make it a part of the suit instituted by OFTA against CEI and attempt to have the royalties owing to petitioner by CEI offset against *252 the commissions finally determined to be owing by KVS to CEI. Since OFTA had instituted a suit against CEI and KVS had been made a party thereto by reason of CEI's counterclaim, the attorney was of the opinion and so advised petitioner that it would be to her benefit for her to make an assignment to KVS of the royalties owing to her by CEI at the time of the cancellation of the contract of June 10, 1946, with the understanding that KVS become her debtor in the amount ultimately determined as due her on the royalties and that after such ultimate determination KVS would credit her with that amount on its books and would pay her such amount when it was able to do so and that KVS would bear such expenses as would be involved with respect to the royalties. Pursuant to the foregoing advice given by the attorney and the acceptance by KVS of the arrangement proposed therein, the petitioner on January 17, 1951, executed an instrument wherein she transferred and assigned to KVS all her rights and claims against CEI for unpaid royalties due under the contract of June 10, 1946. By the instrument KVS was granted the right to receive, recover, and collect the said royalties in its own name, but *253 at its own cost and expense, to commence and prosecute all actions and proceedings for the purpose of recovering and collecting the said royalties, with full power and authority to do everything necessary to be done in the premises. The assignment was made by petitioner for the purpose of obtaining KVS as her debtor for the royalties in place of CEI in furtherance of her effort to obtain a collection thereof. The assignment was not intended to be and was not a gift of the royalties to KVS or a contribution to its capital. Annexed to the assignment of January 17, 1951, and forming a part thereof was a statement prepared by accountants of KVS which indicated that CEI was indebted to petitioner in the amount of $164,383.28 for royalties for the period March 1, 1939 to March 31, 1949, and that sales commissions owing by KVS to CEI amounted to $149,060.57. KVS by a letter dated January 25, 1951, and addressed to OFTA informed the latter that the royalties due from CEI had been assigned by petitioner to KVS and stated that a statement, a copy of which was transmitted therewith, indicated a balance owing to KVS from CEI of $27,701.26 arrived at as follows: Royalties due from CEI
$164,383.28
Cash payments made by KVS for
CEI during the period July 1946
through February 1949
12,378.55
$176,761.83
Less commissions due from KVS
to CEI
149,060.57
$ 27,701.26
*254 Under date of June 19, 1951, KVS and petitioner executed a power of attorney in favor of OFTA with respect to arbitrating their controversies with CEI. During the latter part of 1951, CEI and OFTA, on behalf of itself, KVS, and petitioner, submitted the controverted issues to the French Arbitration Board under an agreement that the decision of the Board would be final and binding on all of the parties thereto and that no appeal or further recourse to courts or other legal process would be taken. On July 5, 1955, the Arbitration Board rendered its decision in the proceeding. In its decision the Board, among other things: 1. Held that KVS was indebted to CEI in the amount of $220,381.62 for sales commissions. In so holding the Board held adversely to the position of KVS that sales commissions, totaling $83,699.60 on three transactions should not be included. 2. Held that CEI was indebted in the amount of $212,385.45 for royalties. In so holding the Board held adversely to the position of CEI that the calculation of the amount of the royalties should be made on conversion thereof from French francs into dollars at the expiration of each quarterly period when the royalties became *255 due. 3. Offset royalties owing by CEI in the amount of $212,385.45 against sales commissions owing to CEI by KVS in the amount of $220,381.62, thereby established a credit balance in favor of CEI against KVS in the amount of $7,996.17 and ordered KVS to pay that amount converted into French francs at the rate of exchange prevailing on the date of the decision. 4. Held that CEI owed 10,000,000 francs for plans, drawings, patterns, calipers, gauges, templates, and jigs which CEI under the contract of June 10, 1946, was obligated to return to petitioner because of the impossibility of compiling a list thereof in order to determine their value. 5. Held that CEI owed 25,000,000 francs for royalties on equipment and spares in stock or inventory manufactured under the contract of June 10, 1946, and sold by CEI subsequent to the cancellation thereof. 6. Found that the result of the cancellation of the contract of June 10, 1946, was that the parties thereto returned to the status quo existing before any contract was entered into between them, subject however to the liquidation of their respective interests and the prohibitions placed on their future activities as provided in the Arbitration *256 Board's decision. As of July 1955, the international rate of exchange between the French franc and the American dollar was approximately equal to 350 French francs to $1. In 1955 no moneys were paid to KVS or to petitioner from CEI. Nor was any money or money equivalent received by petitioner from KVS. Nor was any note or notes evidencing any indebtedness issued in 1955 by KVS to petitioner. Prior to the decision of the French Arbitration Board on July 5, 1955, no entries were made on the books and records of KVS reflecting the assignment of royalties by petitioner to KVS. However, with respect to the assignment of the royalties, KVS in November 1955 set up on its books a deferred-commissions account payable to J. E. Kennedy, Agent, in the amount of $220,381.62. The foregoing amount was composed of $212,385.45 representing the amount found by the Arbitration Board to be owing by CEI to petitioner for royalties and $7,996.17 representing a portion of the sum of the amounts owing by CEI to her as a result of the Board's award pertaining to items other than that with respect to which the sum of $212,385.45 was awarded as royalties. Thereafter, in April 1956, KVS made another entry *257 in its books clarifying the former entry and definitely showing the $220,381.62 as owing and payable to petitioner instead of to J. E. Kennedy, Agent. As so clarified the account continued to remain on the books of KVS and without any payment having been made thereon until after the sale in 1961 of all of the stock in KVS to McNally Pittsburgh Manufacturing Corporation. OFTA collected from CEI on the provisions of the arbitration decision respecting payments for plans, drawings, and patterns and royalties on equipment and spares in the stock or inventory of CEI on the date of the cancellation of the contract of June 10, 1946. Of the moneys so collected OFTA forwarded to petitioner $26,790 in 1956 and $11,970 in 1957. The petitioner reported the foregoing amounts in her income tax returns for 1956 and 1957, respectively. From 1940 and during all times thereafter pertinent herein the financial condition of KVS was such that it constantly was in need of cash and almost all of its manufacturing operations were carried on with borrowed funds. It always was indebted to banks on loans in substantial amounts. In 1951 and subsequent years it obtained the financing it required from Chase *258 Manhattan Bank. On August 23, 1951, and at a time when KVS was indebted to Chase Bank in the amount of approximately $768,000, Joseph E. Kennedy, his wife, and petitioner, who were the principal stockholders of KVS, at the request of the bank executed to the bank a subordination agreement which continued in effect thereafter at all times material herein. By the agreement they subordinated the payment of all existing and subsequently arising indebtedness and claims owing to them by KVS to the payment by KVS to the bank of all its existing and subsequently created indebtedness owing to the bank. In connection with the subordination agreement, KVS agreed with the bank that it would not pay any indebtedness owing by it to Joseph E. Kennedy, his wife, or petitioner contrary to their subordination agreement and that, in the event of a breach by the foregoing persons or by KVS of any of the provisions of the subordination agreement, all obligations and liabilities of KVS to the bank should, without notice or demand, become immediately due and payable unless the bank should elect otherwise. Thereafter and through 1956, Chase Bank continued to make loans to KVS. In addition to sustaining *259 a net loss in 1954, KVS sustained a net loss in 1955 in excess of $1,100,000. On November 30, 1955, and December 31, 1956, KVS was indebted to Chase Bank in the amounts of $437,000 and $1,200,141, respectively. The indebtedness owing on November 30, 1955, represented the total of unpaid balances of demand notes issued by KVS under agreements with the bank whereby assets in the amount of approximately $842,000 had been assigned as collateral. The indebtedness owing on December 31, 1956, likewise represented indebtedness due on notes which were collateralized by assigned assets in an amount of approximately $1,967,000. The net worth of KVS on December 31, 1955, was approximately $394,000. By reason of its financial condition in 1955 and its involvement with respect thereto, KVS was unable during that year to make payment to petitioner of its indebtedness to her in the amount of $220,381.62 or any substantial portion thereof. No payment was received by petitioner on account of such indebtedness until May 1962 when one-tenth of the amount was paid to her in accordance with the terms of the sales agreement whereby in 1961 all of the outstanding capital stock of KVS was purchased by *260 McNally Pittsburgh Manufacturing Corporation. In determining the deficiency for 1955 the respondent increased the petitioner's taxable income for that year by $220,381.62 with the explanation: It is held that you are taxable to the extent of $220,381.62 due to additional royalty or other income which you failed to report for the taxable year ended December 31, 1955. Opinion Taking the position that the petitioner's assignment on January 17, 1951, to KVS of royalties owing to her by CEI was made for the purpose of avoiding the incidence of taxation thereon, the respondent contends that such action of petitioner constituted an assignment of an anticipatory right to income and that she was taxable on the royalties in 1955 when KVS, as assignee, effectively received the benefit of the royalties as a result of the action of the French Arbitration Board in applying the amount of the royalties as an offset against the Commissions owing by KVS to CEI. In support of his position the respondent cites Lucas v. Earl, 281 U.S. 111 (1930); Helvering v. Horst, 311 U.S. 112 (1940); Helvering v. Eubank, 311 U.S. 122 (1940); Harrison v. Schaffner, 312 U.S. 579 (1941); *261 and various cases stemming therefrom. The petitioners point to the fact that the petitioner reported her income on the cash receipts basis. Taking the position that petitioner's course of action with respect to the royalties and their collection was dictated by the exigencies of her situation and not for the purpose of avoiding the incidence of income tax thereon and that she has never made an assignment of an anticipatory right to income, the petitioners contend that she was not during 1955 in receipt of any taxable income with respect to the royalties. Accordingly they contend that the respondent's position and contentions are not supported by the factual situation herein and that consequently the cases cited by him are inapplicable here. We have set out in our findings the circumstances under which the petitioner in January 1951 made an assignment to KVS of the royalties ultimately determined to be owing to her by CEI. In addition we have found that the assignment was made by petitioner for the purpose of obtaining KVS as her debtor for the royalties in place of CEI in furtherance of her effort to effect a collection of them. In addition we have found that by reason of its financial *262 condition in 1955 and its involvement with respect thereto, KVS was unable during that year to make payment to the petitioner of the amount of $220,381.62 here involved or any substantial portion thereof and that no payment on account thereof was received by petitioner until 1962. The evidence further shows and we have so found that petitioner's assignment was not intended to be and was not a gift of the royalties to KVS or a contribution to its capital. The holdings of the Supreme Court in the basic cases relied on by respondent follow. In Lucas v. Earl, supra, it was held that a husband could not shift the incidence of the income tax on his future personal earnings merely by agreeing with his wife to give part of them to her. In Helvering v. Horst, supra, it was held that a taxpayer who severed from a bond owned by him an interest coupon and gave the coupon to his son who thereafter in the same year received cash payment of the interest represented by the coupon, was taxable on the interest received by the son. In Helvering v. Eubank, supra, the taxpayer, a general life insurance agent, after termination of his agency contracts and services *263 as agent, made assignments in 1924 and 1928, respectively, of renewal commissions to become payable to him for services rendered by him under two of his agency contracts. In 1933 the insurance companies paid renewal commissions to petitioner's assignees. No purpose of the assignments appearing of record, other than merely to confer on the assignees the power to collect the commissions as and when they became payable, which the assignees did, it was held that the commissions were taxable as income of the taxpayer in 1933 when paid by the insurance companies. In Harrison v. Schaffner, supra, a life beneficiary of a trust in December 1929 by way of gifts assigned to certain of her children specified amounts in dollars from income of the trust for the following year and made a like assignment to her children and a son-in-law in November 1930. In holding that the assigned income which was paid by the trustees of the trust to the several assignees was taxable as such to the life beneficiary for the years in which paid, the Court said: Since granting certiorari we have held, following the reasoning of Lucas v. Earl, supra, that one who is entitled to receive at *264 a future date, interest or compensation for services and who makes a gift of it by an anticipatory assignment, realizes taxable income quite as much as if he had collected the income and paid it over to the object of his bounty. Helvering v. Horst, 311 U.S. 112; Helvering v. Eubank, 311 U.S. 122. Decision in these cases was rested on the principle that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach of the statute taxing income "derived from any source whatever." In the light of our opinions in these cases the narrow question presented by this record is whether it makes any difference in the application of the taxing statute that the gift is accomplished by the anticipatory assignment of trust income rather than of interest, dividends, rents and the like which are payable to the donor. Since the petitioner's assignment was not made as a gift to KVS or as a contribution to its capital and since it is shown that the purpose of the assignment was the ultimate collection by petitioner as her own and for her own *265 use and benefit such amount as might be finally determined to be owing to her for royalties, we are of the opinion that the holdings in the above-mentioned cases and others relied on by respondent are not applicable or of determinative effect here. In January 1951, controverted and unpaid royalties covering a 10-year period were owing to petitioner by a foreign debtor, CEI. If petitioner proceeded by suit against CEI to collect the royalties, she was faced with instituting and prosecuting in a foreign country an expensive suit which possibly would prove fruitless by reason of CEI's probable efforts to have such suit tied in with or merged with the then pending suit between OFTA and CEI and thereby obtain a decision under which the royalties owing to petitioner would be offset against the sales commissions owing by KVS to CEI. In that situation petitioner chose an alternative procedure and elected to and did enter into an agreement with KVS whereby she made an assignment to KVS of the royalties and KVS agreed to pay her such amount as might ultimately be determined to be owing to her for the royalties when it was able to do so and further agreed that it would bear such expenses as *266 would be involved with respect to the royalties. In its decision of July 5, 1955, the French Arbitration Board made an ultimate determination of the amount of the royalties owing by CEI and in such decision offset such amount against the amount of commissions owing by KVS to CEI. Prior to the assignment the petitioner had an account receivable owing to her by CEI with respect to the royalties. After the decision by the French Arbitration Board the petitioner had an account receivable owing to her by KVS with respect to the royalties. In 1955 the petitioner did not receive any money or money equivalent from either CEI or KVS. The respondent does not, and we think properly so, make any contention that the corporate entity of KVS should be disregarded. From the record presented we are of the opinion that the agreement between petitioner and KVS respecting the royalties was entered into in good faith and without subterfuge and was the equivalent of an arm's length transaction. Since the petitioner reported her income on the cash receipts basis and since in 1955 she received no money or the equivalent thereof and merely acquired an account receivable owing by KVS for the indebtedness *267 previously owing to her by CEI, the petitioners contend that she was not in that year in receipt of taxable income with respect to the indebtedness owing by CEI. In support of their contention the petitioners rely on Estate of W. F. Williamson, 29 T.C. 51 (1957), respondent's acquiescence 1958-2 C.B. 8. In the Williamson case the decedent who reported his income on the cash receipts basis was a stockholder in New Sutherland Divide Mining Company which was in need of funds for competing the construction of a mill for processing ore. In 1947 the decedent, along with a number of other stockholders, agreed to sell a large portion of his stock in the company. Thereafter, Travers, an underwriter, who was interested in getting control of the company, purchased the stock on certain conditions required by him, one of which was the agreement by the vendor-stockholders that the proceeds of the sale of the stock would be loaned by the vendor-stockholders to that company. As a result of the foregoing agreement the proceeds of the sale of the stock went directly to the company and the money never went through the hands of the vendor-stockholders. The proceeds of the sale *268 of the stock were credited to the vendor-stockholders proportionately and were carried on the books of the company as an open account. In 1949 the vendor-stockholders made demands on the company for repayment of the loans. Receipt of the demand was acknowledged by the company but the stockholders were unsuccessful in obtaining any repayment. The issue presented was whether the decedent realized constructive income in 1948 by reason of the fact that his stock was sold and the proceeds loaned to the company. In holding for the petitioner, this Court said: The other controversy as to 1948 deals with an arrangement made by decedent for the sale of his stock in the New Sutherland Divide Mining Company. He, along with a number of other owners, agreed to sell a large portion of his holdings in that company. We have found as a fact that decedent as one of the vendors was forced to and actually did agree with the prospective buyer in advance that the proceeds of the sales would not be available to him but would be transmitted to New Sutherland and treated by it as a further investment or advance by the vendors. Decedent could, to be sure, have refused to sell his stock on such terms just *269 as any seller can refuse to sell on credit. In that case the transaction would not have taken place, there would have been no profits from the sale even on paper, and no question to be raised before the Tax Court. But we fail to see that, having accepted the offer, decedent was any better off when the stock had been sold than any other seller who accepts an account receivable instead of cash for his property. To a cash basis taxpayer, that is not income until the debt is collected. Consolidated Asphalt Co., 1 B.T.A. 79, 82. And once the contract was made, decedent was effectively disabled from receiving, for the stock, cash or its equivalent or any consideration other than an account receivable. See Shiman v. Commissioner, (C.A. 2) 60 F. 2d 65, 66. He was never a free agent as to collecting the proceeds. There is no question that the cash was not actually received by decedent during the tax year, and, under the circumstances, it cannot be said that it was constructively received by him in the sense that it was income available to him and subject to his command but upon which he turned his back. Hal E. Roach, 20 B.T.A. 919; L. M. Fischer, 14 T.C. 792; *270 Harold W. Johnston, 14 T.C. 560; cf, John I. Chipley, 25 B.T.A. 1103; John A. Brander, 3 B.T.A. 231. And certainly the open account on New Sutherland's books was not so nearly the equivalent of cash that it could be construed as income to a cash basis taxpayer. Nina J. Ennis, 17 T.C. 465; Harold W. Johnston, supra."So far as we have been able to ascertain, a promise to pay evidenced solely by an open account has never been regarded as income to one reporting on a cash basis by the Bureau of Internal Revenue. Certainly this is true in the absence of any showing that the amount was immediately available to the taxpayer." John B. Atkins et al., 9 B.T.A. 140, 149, affd. (C.A., D.C.) 36 F. 2d 611. On this issue petitioner is sustained. Since in the instant case the petitioner in 1951 had only an account receivable owing by CEI prior to her agreement with and her assignment to KVS and in 1955, the taxable year herein issue, had only an account receivable owing by KVS and evidenced by an open account on its books, we are unable in the light of the reasoning and holding in the Williamson case to *271 find that petitioner in 1955 was in receipt of taxable income in the amount of $220,381.62, as determined by respondent, or in any other amount. The petitioners are sustained as to this issue. Issue 2. Respondent's failure to determine that an amount of $157,141.12 received by petitioner in 1955 pursuant to certain contracts involving patents and reported as ordinary income from royalties in the return of petitioners for that year constituted long-term capital gain realized from the sale or exchange of patents. Issue 3. Respondent's failure to determine that an amount of $109,076.35 received by petitioner in 1957 pursuant to certain contracts involving patents and reported in the return of petitioners for that year as long-term capital gain constituted long-term capital gain realized from the sale or exchange of patents. Findings of Fact In addition to the contracts involving patents entered into by petitioner with CEI and OFTA as set out in our findings in Issue 1 above, the petitioner also entered into contracts with other foreign companies involving other foreign patents as set out below. On January 11, 1951, the petitioner entered into a contract with Franco Tosi of *272 Leomano, Italy, wherein the petitioner granted that company the exclusive right to make and sell in Italy and other specified countries specified machinery under Italian patents owned by petitioner. The term of the contract was 15 years with provision for renewal for a term of 10 years. By a contract entered into by petitioner and John Thompson (Australia) Pty., Ltd., of Sydney, Australia, on September 4, 1953, the petitioner granted that company an exclusive right to make and sell in Australia specified machinery under Australian patents owned by petitioner. The term of the contract was 18 years. In a contract entered into by petitioner and Sheepbridge Coal & Iron Co., Ltd., of Chesterfield, England, on August 5, 1933, the petitioner granted that company "an exclusive perpetual license to manufacture and sell machinery and equipment in the British Empire except that part in North America and Australia" under British patents owned by petitioner. The contract contained the statement that the term perpetual contract (right) was especially agreed to by the parties because of the vastness of the line of machinery involved and was to be considered as the turning over by the petitioner *273 to Sheepbridge of an established business and the royalties to be paid to petitioner under the contract were to take the place of stock interests in Sheepbridge and at the same time leaving the complete control of the business of making and selling forever in the hands of Sheepbridge. Thereafter and under circumstances not disclosed, the petitioner and Sheepbridge on October 1, 1945, entered into another contract wherein the foregoing contract between them of August 5, 1933, was canceled. By the contract of October 1, 1945, the petitioner granted Sheepbridge the exclusive right to make and sell in the British Empire, except that part in North America and Australia, specified machinery under patents owned by petitioner. The contract also provided for the payment by petitioner to Sheepbridge of a "commission" of 2 1/2 percent on certain machinery and spares made and sold by John Thompson Water Tube Boilers, Ltd., of Wolverhampton, England, sometimes hereinafter referred to as Thompson Boilers, as and when received by petitioner from Thompson Boilers. The contract of October 1, 1945, between petitioner and Sheepbridge was for a term of 18 years. By a contract entered into by the petitioner *274 and Thompson Boilers on October 27, 1945, and sometimes hereinafter referred to as the first contract of October 27, 1945, the petitioner granted to that company for a period of 18 years the exclusive right to make and sell in the British Isles and Australia specified machinery under British patents owned by petitioner. On October 27, 1945, the petitioner and Thompson Boilers executed another and separate contract, sometimes hereinafter referred to as the second contract of October 27, 1945. In such second contract the petitioner agreed to furnish to Thompson Boilers full technical information and advice to enable it to design and install power plants incorporating certain pulverized coal equipment designed by Joseph E. Kennedy and manufactured in the United States by KVS and also such information and advice as to future improvements or variations invented respecting such machinery manufactured by KVS or known by petitioner. In the contract Thompson Boilers as consideration for the foregoing promise of petitioner agreed to pay to the petitioner a "royalty" of 5 percent on all of the abovementioned equipment and spare therefor installed by it and further agreed, among other things, *275 that it would not be interested, directly or indirectly, in the design and installation of competitive equipment except where the purchaser specified competitive equipment and that it would not divulge information to others that would enable them to design and install the above-mentioned equipment. The contract was for a term of 18 years with a provision for renewal at the end of the term if satisfactory to both parties thereto. In connection with the above-mentioned contracts the petitioner during 1955 and 1957 received payments from the indicated foreign companies in the following amounts: Year received
Company
1955
1957
CEI
$ 11,970.00
OFTA
$ 44,881.38
7,746.69
Franco Tosi (Italy)
49,290.09
39,305.30
John Thompson, Ltd.
(Australia)
2,061.73
Sheepbridge Coal & Iron
Co., Ltd. (England)
25,713.47
47,992.53
John Thompson Water
Tube Boilers, Ltd.
(England)
37,256.18
Total
$157,141.12
$109,076.25
All of the above amounts were paid on sales made in exclusive territories covered by the respective contracts. The petitioners reported the above-mentioned amount of $157,141.12 received in 1955 as royalties in their income tax return *276 for 1955 and reported in their return for 1957 the amount of $109,076.35 received in 1957 as long-term capital gains from the sale of patents. In determining the deficiencies here involved the respondent determined that the foregoing amounts constituted royalties and were taxable as ordinary income. Opinion The petitioners take the position that the amounts received by petitioner in 1955 and 1957 as set out in our findings constituted long-term capital gains from the sale or exchange of the patents involved in the various contracts in connection with which the amounts were received and contend that the respondent erred in not determining that such amounts were taxable as long-term capital gains. The petitioners concede on brief that since petitioner was the owner of the patents here involved as donee of her father, she was not a holder of the patents within the purview of section 1235 of the Internal Revenue Code of 1954. Accordingly the petitioners make no claim for the special capital gain treatment provided in that section. The respondent contends that the contracts in connection with which the amounts in issue were received by petitioner did not effect *277 assignments of the patents involved therein and consequently did not effect sales or exchanges of them and that he did not err in determining that such amounts were taxable as ordinary income. The purpose of the capital gains provisions of the Code is to relieve taxpayers from the excessive tax burdens on gains resulting from a conversion of capital investments and to remove the deterrent effect of those burdens on such conversions. The capital gains provisions, therefore, provide an exception to the normal tax requirements of the Code. Consequently such provisions are to be narrowly applied and exclusions therefrom broadly interpreted so as to exclude from their operation situations not coming clearly therein in order to protect the revenue from artful devices. Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958); Corn Products Co. v. Commissioner, 350 U.S. 46 (1955). The words "sale" or "exchange" as used in the Internal Revenue Code must be given their ordinary meanings. Helvering v. Flaccus Leather Co., 313 U.S. 247 (1941); Gaius G. Gannon, 16 T.C. 1134 (1951). "A sale, in the ordinary sense of the word, is a transfer of *278 property for a fixed price in money or its equivalent." Iowa v. McFarland, 110 U.S. 471, 478 (1884); Betty Rogers, 37 B.T.A. 897 (1938), affd. 103 F. 2d 790 (C.A. 9, 1939), certiorari denied 308 U.S. 580 (1939). In the case of patents, as well as of other property, there must be a transfer of all rights in the property necessary and requisite for a sale. An essential requirement for a sale of a patent is a transfer of the exclusive rights to make, to use, and to sell the patented article within a specified area or areas. A transfer of the exclusive right merely to make and to sell such article within a specified area or areas is only a license since there is lacking a transfer of the right to use such article. While a transfer of the exclusive right only to make and to sell a patented article in a specified area or areas may carry by implication the right of the licensee to use articles made under the patent by the licensee, it would not authorize the licensee to use such article made by others. Waterman v. Mackenzie, 138 U.S. 252 (1891); United States v. Gen. Elec. Co., 272 U.S. 476 (1926); Edward C. Myers, 6 T.C. 258 (1946); *279 Cleveland Graphite Bronze Co., 10 T.C. 974 (1948), affd. 177 F. 2d 200 (C.A. 6, 1949); Lynne Gregg, 18 T.C. 291 (1952), affd. 203 F. 2d 954 (C.A. 3, 1953); National Bread Wrapping Machine Co., 30 T.C. 550 (1958). In instances where the exclusive rights to make and to sell were transferred but the right to use was not expressly transferred and other provisions of the contract or extraneous evidence as to the intention of the parties, or both, clearly established an intent to transfer the right to use, it has been held that such right also was transferred. Rose Marie Reid, 26 T.C. 622 (1956); Robert L. Holcomb, 30 T.C. 354 (1958). The contracts here involved consist of nine lengthy instruments, all of which we have carefully considered. As a result of our consideration and reserving for discussion below the second contract of October 27, 1945, between petitioner and Thompson Boilers, we are of the opinion that none of the contracts was intended to be or was anything other than a mere license to make and sell machinery under patents owned by the petitioner and consequently did not effect *280 a transfer and sale of the patents involved therein. The respondent's determination that the amounts received by petitioner during the years in issue pursuant to such contracts were taxable as ordinary income is sustained. The second contract of October 27, 1945, between the petitioner and Thompson Boilers does not purport to be a patent licensing arrangement or an arrangement for the assignment and sale of any patents. Standing alone as it does, since the record otherwise does not indicate the circumstances leading to its execution or indicate how the parties operated in carrying it out, the contract appears to be in the nature of an employment arrangement whereby Thompson Boilers engaged the petitioner for a period of 18 years to furnish it with such technical information and advice as it might require from time to time during the term of the contract to enable it to design and install power plants incorporating therein certain specific equipment. Such being the situation we fail to perceive how such amounts as the petitioner may have received pursuant to the contract constituted capital gain. The respondent has determined that the $37,256.18 received by petitioner from Thompson *281 Boilers in 1955, the only year involved herein during which petitioner received any payment from that company, was taxable as ordinary income. From the record before us we are unable to conclude that he erred in so doing. Decision will be entered under Rule 50.